CLIFFORD A. BONDS *v.* THOMAS J. LIPTON COMPANY.

1. SALES. *Cipher telegrams. Letters. Evidence. Statute of frauds. Code 1892, § 4229.*

Where a contract for the sale of personal property is evidenced by letters between the parties, fully recognizing the existence and setting forth the terms of the contract, it is immaterial that precedent cipher telegrams do not sufficiently show a sale to take the case out of the statute of frauds.

2. SAME. *Rescission. Tender. Place.*

Where goods were bought with the understanding that they were to be shipped by the seller to the buyer when the buyer thereafter ordered, and the buyer recognized that the seller held the goods on his account, it is not necessary for the seller to tender the goods to the buyer at the latter's place of business after he gives notice that he will not receive them if shipped, in order to hold the buyer liable for a breach of the contract.

3. SAME. *Breach of contract. Custom.*

Where the meat contracted for was "smoked meat," it is immaterial that the meat sold upon breach of contract by the seller for the purchaser's account was not smoked, it being shown that

85 Miss.—14

the meat was sold to be shipped on the buyer's order, that "smoking" was a process to which meat is submitted, according to the custom of the trade, only immediately prior to shipment, and that the buyer failed to give shipping directions.

4. SAME. *Harmless error. Evidence.*

The erroneous admission in evidence of copies of telegrams is not ground for reversal of a judgment predicated of a contract which the copies were intended to establish, if the contract be otherwise fully proved by competent and undisputed evidence.

FROM the circuit court of, first district, Hinds county.

HON. DAVID M. MILLER, Judge.

The Thomas J. Lipton Company, a corporation, the appellee, was plaintiff in the court below; Bonds, appellant, was defendant there. From a judgment in plaintiff's favor defendant appealed to the supreme court. The opinion states the case.

*Harper & Potter,* for appellant.

After the evidence had all been introduced, the appellant asked for a peremptory instruction, directing the jury to find for him for several reasons: (1) Because, under the statute of frauds, the cipher telegrams, interpreted as above shown, do not sufficiently show a sale. (2) Because the Lipton Company never made an offer to deliver the meat. (3) Because the re-selling, under the circumstances of the case, was a rescission of the contract. (4) Because the copies of the telegrams offered in evidence over the objection of appellant were incompetent, and no proper proof of the contract had been made.

The court below, over the objection of defendant, gave to the jury an instruction to find for the plaintiff in the sum of $250. This was objected to then, and is now, for the reasons above given, and because, if the plaintiff could recover at all in this case, it would be for the difference between the purchase price and the market price on the 1st day of May, which would be the date of the breach of the contract, and the record shows that meat of the character in question was twenty-five points higher on the 1st day of May than on the date of the sale to Jackson Bros. of June 22d. And based on these figures, if the

meat had been sold in a reasonable time after the breach and expiration of the contract period, the loss would have been but little more than $300; whereas, according to the sale made June 22d, fifty-two days after the expiration of the contract period, the loss exceeded $500. Another reason why appellant contends that he ought not to be bound by the reselling is that the meat negotiated for was bacon or smoked ribs, whereas the meat resold to Jackson Bros. was dry salt, or unsmoked ribs. The record shows that prior to the time of the trial of this case the action had been dismissed against J. C. Hood upon payment by him of $250. There was a verdict and judgment against appellant for $250.

The contract in the suit is an executory one, as the only participation in what was done by Hood & Co. prior to the expiration of the contract term was the sending of the telegram: "Book us subject to your confirmation 50,000 pounds bacon ribs, 40/45 average at 11/10 buyer's option April." Whatever else was done by the Lipton Company, as shown by the witness, Dunne, was wholly without the consent or participation of the buyers. Under the agreement the Lipton Company were not required to set apart any particular meat, and if that was done, as testified by Dunne, in case of loss by fire, it could not be held to have been the property of Hood & Co., but, on the contrary, they would still have the right to expect a delivery of the meat in Jackson at the end of the contract time. In other words, the meat would not, by reason of anything they had done, become their property absolutely until delivery was made at Jackson, Mississippi. *Berry* v. *Waterman*, 71 Miss., 497; *Ouilette* v. *Davis*, 69 Miss., 762; *Wilson* v. *Empire Dairy-Salt Co.*, 63 N. Y. Supp., 565.

"Where property sold is agreed to be delivered between certain designated dates, it is optionary with the purchaser to designate on which day he will receive it, and his failure to do so fixes the last day as that on which he may be required to perform the contract." *Sousely* v. *Burns*, 10 Bush. (Ky.), 87.

J. C. Hood & Co. having remained silent as to shipping directions, it became the duty of the Lipton Company, under the contract, to actually tender the meat at Jackson upon the last day of the contract term, the appellant having given no intimation that it would not be received. Neither party can maintain an action merely and simply on the ground that the other party has not performed his covenant. *Chandler* v. *Robertson,* 9 Dana (Ky.), 295; *Clark* v. *Fey,* 51 Hun., 639 (4 N. Y. Supp., 18); *Hill* v. *Blake,* 97 N. Y., 216; *Gehl* v. *Produce Co.,* 105 Wis., 573.

"The weight of authority is that a sale without notice is an abandonment of the contract." And this is put upon the ground that the buyer has an interest in the article when held by the seller, and that he must be notified in order to give him an opportunity to protect his interest, and to either buy himself or to make the article bring the best possible price. Any other rule than this might lead to disastrous consequences, especially with articles not staple and that had no fixed market value. *Leonard* v. *Portier,* 15 S. W. Rep., 414; *Kemper* v. *Heidenheimer,* 65 Tex., 567; *McClure* v. *Williams,* 5 Sneed, 718; *Richmond* v. *Smock,* 28 Ind., 365; *McEachron* v. *Randles,* 34 Barb., 301; 2 Benjamin on Sales, sec. 1164, note 2; Story on Sales, sec. 314; 24 Am. & Eng. Ency. Law (2d ed.), 1140, and cases there cited.

The court will see that the proof of contract was made by copies of telegrams, and that the originals were not in evidence, nor was it shown that the originals could not be produced.

The court will see that the trial judge, by the instruction for appellee, fixed the measure of damages based on the resale. This, we think, was clearly erroneous. "Where an article is to be delivered at a certain place, on or before a day named, the breach can only occur on the last day named, and the damages will be the difference between the value of the article on that day and the contract price." *Phelps* v. *McGee,* 18 Ill., 155.

We do not deny that where the goods were tendered and refused, the seller may resell the property; but the rule is not without qualifications, among which is the one that the resale must be within a reasonable time and absolutely fair, looking to the best interest of the buyer, and after notice to him of a purpose to resell. *Clure* v. *Jamieson*, 182 U. S., 461; *Penn* v. *Smith*, 98 Ala., 560; *Camp* v. *Hamlin*, 55 Ga., 259; *Roeblings Sons Co.* v. *Fence Co.*, 130 Ill., 670; *Bagley* v. *Findlay*, 82 Ill., 526; *Saladin* v. *Mitchell*, 45 Ill., 85; *Linseed Oil Co.* v. *Kearney*, 14 La. Ann., 352; *Rickey* v. *Tenbroeck*, 63 Mo., 567; *Ackerman* v. *Rubens*, 167 N. Y., 405; *Smith* v. *Pettee*, 70 N. Y., 13.

Whether a discretion to resell is exercised properly and in good faith is a question of fact for the jury. *Lewis* v. *Greder*, 51 N. Y., 231.

*J. H. Thompson,* for appellee.

There was no question raised in this case which should have been submitted to a jury. The testimony indisputably shows that the firm of J. C. Hood & Company violated their contract of purchase; that the Lipton Company stood ready, willing, and anxious at all times to comply with the terms of the sale; that they exercised care and prudence in disposing of the goods when they resold them to third persons, and that they suffered loss for which Hood & Company were responsible. The testimony of Mr. J. C. Hood—and it is to be remembered that he was one of the defendants to the suit—conclusively shows a liability on the part of his company, explains fully the custom of the trade in the carrying on of such transactions, and, taken with the testimony of the witness Dunne and the letters of defendant Bonds himself, leaves no doubt as to the propriety of the action of the trial court. It is a significant fact that defendant Bonds does not come upon the stand to testify in the case. The record justifies the inference that the secret of this matter being in court is the dissolution of the firm of J. C. Hood & Company, and the dispute between the members thereof, J. C.

Hood and C. A. Bonds, and the equally clear inference that there would have been no dispute between the Lipton Company and defendant, and this claim would have been paid, had Hood and Bonds remained in partnership or dissolved with a satisfactory understanding of the terms of dissolution. But any disagreement between Hood and Bonds as to the particulars of their dissolution early in May can have no bearing upon appellee's rights. Appellee sold the meat to J. C. Hood & Company. Hood recognizes the rights of appellee; he clears the whole transaction up by his testimony, and rather than put himself in the attitude of fighting a just claim in the courts of the country, he pays $250 for a dismissal of the suit as to him, and takes his chances of making this money back out of Bonds under their contract of dissolution wherein Bonds assumes liabilities of the firm. Bonds, in his letters, recognizes the justice of appellee's claim, and does not deny liability to the Lipton Company; but he, unlike Mr. Hood, fights the claim, and, as the record will show, attempts to defend upon technical grounds alone. In Bonds' first letter on the subject, he says: "I have purchased the business, but this matter belongs to Mr. Hood, who will arrange the matter satisfactorily with you. Please keep me advised as to the two cars of ribs if Mr. Hood does not arrange the matter satisfactorily." As before stated, the Lipton Company knew only the firm of J. C. Hood & Company in this transaction, hence any claim of Bonds that this matter belonged to Hood can have no bearing in this case. As to this, note Bonds' next letter on the subject, wherein he states: "Please advise what you will charge to cancel this contract, unless Mr. Hood's letter to you is satisfactory. And upon receipt of the above information I will take up the matter and arrange to your satisfaction." It is true that Mr. Hood wrote appellee as late as May 14 that he expected to "place" these cars without any loss, and Bonds writes that he "will see Mr. Hood" about the matter, and on May 30 Mr. Bonds writes, among other things: "It looks as if Hood & Company are going to have a loss." It

is to be borne in mind that this is written long after the month of April had passed, by the defendant, himself a broker, and of course advised of the custom of the trade in such dealings, and it is submitted that, taken with the other evidence herein, this disposed of the claim of appellant that when the last day in April had passed the contract was at an end, and that appellee should have sold the meat to third persons on that day. The fact that Hood & Company did not call for same in April did not amount to a rescission of the contract *eo instanti,* nor was it so treated by either party to the deal. It is also to be borne in mind that after the early part of May Bonds was the owner of the business of J. C. Hood & Company. Bonds writes still further on June 24, after receipt of Lipton's letter of June 22, in which he was advised that the meat had been sold to third persons by said Lipton Company: "It will be necessary for you to look to the firm of J. C. Hood & Company for collection." An admission of the justness of the debt which he is now here trying to evade by technicalities and quibbles; not one word in the nature of a denial thereof, only something in the nature of a complaint against Hood—a matter wholly between himself and Hood, and which can have no effect whatever upon the rights of the appellee.

It is submitted that these letters of Bonds, all the correspondence, and all the other evidence in the case are one way, showing conclusively that, according to the customs of trade and the ordinary course of business of meat dealers and brokers, and the contemplation of all parties in interest, there was an absolute sale, a wrongful violation of the terms thereof by the purchaser, and a loss occasioned to the seller for which the seller is entitled to recover. I am unable to see how anything in this record can be construed as casting doubt upon this proposition, or how it could be maintained that the trial court could have done otherwise than as it did.

Appellant's contention as to the statute of frauds is without foundation, and his exception to the introduction of the tele-

grams in question is not well taken. It will be noted that the telegrams, exhibits to the testimony of the witness J. T. Dunne, are the originals received by the Thomas J. Lipton Company— that is, they are the original papers delivered to said Lipton Company at Chicago by the telegraph company; and the copies of the telegrams sent by the Lipton Company to appellant, which are attached to said deposition, were kept by the Lipton Company in the due course of their business. 27 Am. & Eng. Ency. Law (2d ed.), 1091.

The case of *Shingleur* v. *Telegraph Co.,* 72 Miss., 1030, is distinguishable on this subject from the case in hand. In this case there is no question about the correct transmission of the messages, while in that case there was an incorrect transmission by the telegraph company, and that was a case wherein the telegraph company was a party to the suit, as defendant to a claim for damages.

"Proof of the sending of a telegram accepting an offer made and completing a contract is sufficient evidence of subscription to take the case out of the statute of frauds." 23 Century Digest, citing *Trevor* v. *Wood,* 93 Am. Dec., 511.

It was not necessary for the Lipton Company to bring the meat to Jackson and make an actual tender thereof to defendants. After they saw that defendants would not accept the meat, after they had reached the entirely reasonable conclusion that to bring the meat to Jackson would only add to their loss and expense; after they had waited a reasonable length of time, insisting all along, by letters and telegrams, upon Hood & Company's coming up to their part of the contract, and saw that Hood & Company would not accept the meat, it was their duty to dispose of it to the best possible advantage, so as to reduce the amount of loss as much as possible.

Argued orally by *W. R. Harper,* for appellant, and *J. H. Thompson,* for appellee.

TRULY, J., delivered the opinion of the court.

On March 4, 1903, J. C. Hood & Co., a partnership composed of J. C. Hood and C. A. Bonds, doing a brokerage business at Jackson, Miss., closed a contract of purchase with the Thos. J. Lipton Company, meat dealers of Chicago, Ill., for 50,000 pounds of bacon ribs, at a price named. The negotiations were conducted and the contract concluded by telegraphic communications, which were sent in a cipher in use by the parties. The final telegrams, consummating the contract of purchase, were as follows: One from Hood & Co. to appellee in these words: "Book us subject to your confirmation 50,000 pounds bacon ribs, forty to forty-five average, at 11–10 buyer's option April." On the same day the Lipton Company wired confirmation of the sale as follows: "Booked 50,000 lbs. bacon ribs 40 to 45 average 11–10 buyer's option April." During the month of April, J. C. Hood & Co. failing to transmit shipping orders to appellee, several communications, both by letter and telegram, were sent by appellee to Hood & Co., requesting directions as to shipment and delivery. These were not responded to. After the expiration of the month of April, appellee wrote J. C. Hood & Co. that, as they had failed to receive any shipping instructions in reference to the 50,000 pounds of bacon ribs sold them, they had been, in accordance with established custom, placed in storage for the account of Hood & Co., and that the usual storage charge of 10 cents a month per 100 pounds would be charged. During the month of May the firm of J. C. Hood & Co. dissolved, C. A. Bonds purchasing the interest of J. C. Hood. From the date of this dissolution a great deal of correspondence was carried on between the individual members of the late firm of J. C. Hood & Co. and the appellee in reference to the meat purchased and then held in storage by the Lipton Company for Hood & Co. No definite conclusion was arrived at, and, the matter being unadjusted, on the 22d of June the Lipton Company, in open market, in the city of Chicago, sold the 50,000 pounds of meat which had been stored

for Hood & Co. for their account, and credited the proceeds. From the date of the purchase of the meat, on March 4th, until the day of the sale, on June 22d, the market price of this class of meat had steadily fallen, so that, after crediting the proceeds of the meat on June 22d, there remained due the Lipton Company the sum of $550. For this amount appellee filed its suit against J. C. Hood & Co. After the institution of suit, J. C. Hood individually paid $250 to appellee in settlement of the amount due by him on the contract. The suit proceeded against C. A. Bonds. At the conclusion of testimony the court gave a peremptory instruction in favor of appellee for $250. From this judgment C. A. Bonds appeals, and assigns four grounds of error, which will be discussed in the order of presentation.

It is said the contract is void under the statute of frauds, and that the cipher telegrams, interpreted as above shown, do not sufficiently show a sale. But the inescapable reply to this contention is that the letters which passed between appellee and J. C. Hood & Co. and C. A. Bonds distinctly recognize the existence of a contract, and set forth with absolute certainty the details of the transaction. See letter of appellant "respecting two cars of ribs purchased by Mr. Hood" and asking to be kept advised. In addition to this, J. C. Hood, the member of the firm by whom the contract was made, admitted the contract and acknowledged the correctness of the cipher telegrams as transcribed; and this undisputed testimony, when considered in connection with the letters, clearly establishes the consummation of the contract.

It is next said that the appellee is not entitled to recover because the Lipton Company never made an effort to deliver the meat, and it is contended that it was the duty of the appellee to have the meat actually transported to the city of Jackson, and there tendered Hood & Co. The reply to this is that the meaning of the technical phrase "buyer's option April" is that it is for the buyer to give shipping orders if, and when, he desires the meat to be actually delivered. This meaning is made

evident by the testimony of Mr. Hood and by the depositions of the employes of the appellee, and is nowhere disputed in this record. Under the terms of the existing contract, therefore, the appellee was not bound to make any actual delivery or tender of the meat unless previous shipping orders had been given it by the purchasers. This fact is clearly recognized in the letters from C. A. Bonds to the appellee, and in some of those letters written subsequent to the last of April, the date when counsel for appellant contends the delivery ought actually to have been made, Mr. Bonds impliedly admits that the meat is being held for the account of Hood & Co., and acquiesces in that arrangement, inquiring of the Lipton Company what their "carrying charge" amounted to—meaning, of course, the cost of having the meat kept in storage, in the hope of an advance in price, so that the loss which he then recobnized as inevitable, and his liability for which he did not deny, might be reduced to a minimum. Note appellant's letter of May 30th, in which, after stating when he first acquired knowledge of the purchase of the meat and his desire to arrange the matter, he proceeds: "It looks as if Hood & Co. are going to have a loss. In order to get out of the matter, what is your carrying charge? It is thought we will have higher meat, and can possibly get out of it by carrying it thirty or sixty days." Under the facts of this record, and the terms of the contract as construed by Hood and the appellee, and not denied by the appellant, and the course of dealing between the parties, we do not think it was incumbent upon the appellee to have had the meat actually transported to the city of Jackson and tendered to a customer who had already evidenced his intention of not receiving it. The action of appellee in this regard was for the best interests of all concerned. To have brought the meat to Jackson would simply have been to have added the transportation charges to the loss of Hood & Co., and would have placed this large quantity of meat on a smaller market for a forced sale, when, as shown by the correspondence of Hood & Co., they had been unable to make any sale of it. It is in

testimony, and undenied, that meat in such quantities could be disposed of to a better advantage in Chicago upon the open market than at any smaller place. In the absence of contradiction, we must take this statement as true.

It is next argued that appellee is not entitled to recover because the reselling of the meat, under the circumstances of this case, was a rescission of the contract, and it is urged that, in truth, there never had been any actual sale of any specific lot of meat to Hood & Co.; that there had been no segregation of this quantity of this particular class of meat by the appellee. But here, again, the appellant is met by the uncontradicted statement of the agents and employes of the Lipton Company, who testified that there was in fact an actual segregation and setting apart of the specific quantity of the particular class of meat sold to Hood & Co., and that from the date of the purchase, on March 4th, to the date of the sale, June 22d, the Lipton Company had in its warehouse never less than the identical amount which Hood & Co. had purchased, and, when the supply of this special class of meat was reduced to the quantity which Hood & Co. had purchased, appellee's offering list showed no offer to sell any meat of that special kind. It is suggested by appellant: Suppose the meat had been destroyed by fire or other casualty while in the warehouse in Chicago after March 4th, would the court have held the loss to have been entailed upon Hood & Co.? Had the loss occurred prior to the time when the buyer's option expired, undoubtedly not, for the reason that the very term "buyer's option April" permits the buyer to allow his meat to remain without risk or cost to him until the date of the expiration of the option given by the terms of the contract. If the loss had been after the meat was actually placed in storage for the benefit of Hood & Co., then the question of loss of the meat upon destruction by casualty would depend on the terms and condition of the storage, and cannot be answered with any degree of certainty from the facts detailed in this record. But it is said that the reselling of the meat under the circumstances

shown by this record was a rescission of the contract, because the meat actually sold on the market by the Lipton Company was not what is denominated "smoked meat," whereas the meat contracted for by Hood & Co. was of that class. But this objection vanishes in the light of the testimony, which shows that smoking is simply a process which the meat is subjected to immediately prior to shipment, and, inasmuch as the buyer failed to give any shipping directions, it was never necessary to put the additional expense entailed by the smoking process upon the buyer, and the record shows that this is credited on the statement of account between the parties.

Lastly, it is urged that the copies of the telegrams offered in evidence were incompetent, and that no proper proof of the contract was made. We have shown in our consideration of the first objection that the proof of contract does not depend upon the copies of the telegrams alone, but is also shown by the letters, the genuineness of which was not denied. We find it unnecessary to enter upon any extended discussion of the question as to the admissibility as evidence of copies of telegrams, for the reason that, even if in the instant case they were inadmissible, it could avail the appellant nothing, because, with them out of the record, the proof of the contract, in all of its terms and conditions, is specifically made, and, more than that, acknowledged by the member of the firm who made the contract, and who has not only acknowledged his liability for a proportionate part of the loss, but has promptly acquitted himself thereof by payment in full.

None of the assignments of error are tenable. The appellant has no cause to complain at the amount of the judgment. It is, in truth, something less than was warranted by the proof.

*Affirmed.*